**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **RACHEL CANNON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:05cv0111** |
| | ) | |
| **JO ANNE BARNHART,** | ) | **Judge Thomas A. Wiseman, Jr.** |
| **Commissioner of Social Security** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

This civil action was filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff was not disabled and denying Plaintiff Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), as provided under the Social Security Act ("the Act"), as amended. Currently before the Court is Plaintiff's Motion for Judgment on the Administrative Record. (Doc. No. 11.) Defendant has filed a Response, arguing that the decision of the Commissioner was supported by substantial evidence and should be affirmed. (Doc. No. 15.) Plaintiff has filed a Reply reiterating her arguments. (Doc. No. 17.)

For the reasons stated below, Plaintiff's Motion for Judgment on the Administrative Record will be denied and the decision of the Commissioner affirmed.

**I.     INTRODUCTION**

Plaintiff filed her applications for DIB and SSI on February 13, 2001, alleging that she had been disabled since April 25, 2000 due to high blood pressure, diabetes, feet and leg pain, and endometrial cancer. (Doc. No. 8, Attachment ("AR"), at 19, 68, 78, 512.) Plaintiff's applications were denied both initially and upon reconsideration. (AR 36–37, 38–39, 516–17, 523–24.) Plaintiff subsequently requested and received a hearing. (AR 51, 59–67.) Plaintiff's hearing was conducted on August 20, 2003 by Administrative Law Judge ("ALJ") Donald E. Garrison. (AR 530.) Plaintiff and vocational expert ("VE") Dr. Gordon H. Doss appeared and testified at the hearing. (AR 530–31.)

On May 6, 2004, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations. On June 28, 2004, the SSA

received Plaintiff's request for review of the hearing decision. (AR 13–15.) On August 17, 2005, the Appeals Council issued a letter declining to review the case (AR 7–9), thereby rendering the decision of the ALJ the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. §§ 405(g) and 1383(c)(3). If the Commissioner's findings are supported by substantial evidence, based upon the record as a whole, then these findings are conclusive. *Id.*

## II.    REVIEW OF THE RECORD

### A.    Medical Evidence

Plaintiff began seeing Dr. Michael Cox of the Livingston Clinic as her primary care physician at least as early as 1986. (*See* AR 222.) Dr. Cox diagnosed her with high blood pressure, or "essential hypertension," as of October 1987, when she was 28 years old. Dr. Cox prescribed Capoten. On follow-up, Plaintiff's blood pressure was still not well controlled. Dr. Cox added a prescription of hydrochlorothiazide, increased her dosage of Capoten and, noting that she weighed 227 pounds, recommended that she lose weight. (AR 222.)

Plaintiff continued to see Dr. Cox on a fairly regular basis for treatment of her hypertension and other routine medical needs over the next several years. (AR 199-329 (records dating from August 1986 through July 2001.) Plaintiff first began complaining of abnormal periods in August 1990 (AR 216), and she was first noted to have diabetes in September 1993 (AR 203). She first began complaining of back pain in March 1994 (AR 201). A thoracic spine series was performed at that time, the results of which were normal. (AR 212, 418.) Plaintiff related her back pain to an incident at work. (AR 201.) In June 27, 1995, Plaintiff complained to Dr. Cox of bilateral knee pain, reporting that her knee would "give out" when she was working. Dr. Cox diagnosed Plaintiff with early osteoarthritis, in addition to her hypertension and diabetes mellitus. (AR 298.)

Plaintiff saw Dr. Cox on August 17, 1995 for low back pain stemming from lifting boxes at work. Dr. Cox diagnosed Plaintiff with a lumbar strain and proscribed Robaxin. (AR 297.) Five days later, Plaintiff returned to Dr. Cox complaining that her back pain had not been relieved by Robaxin. (AR 296.) A lumbar spine series was performed, which yielded normal results. (AR 296, 418.) Dr. Cox diagnosed Plaintiff with a lumbar strain and prescribed Darvocet. (AR 296.)

Plaintiff was discontinued on Glucophage and started on Rezulin in August 1998. (AR 274–75.) Even after she started on Rezulin, her blood sugar levels were frequently uncontrolled, and Dr. Cox's notes indicate Plaintiff's compliance with the recommended diet was sporadic at best, and she was apparently not able to lose weight.

After having complained about irregular periods for nearly ten years, she was diagnosed by a Dr. Terry as having dysfunctional uterine bleeding and "polypoid complex endometrial hyperplasia with focal moderate to severe cytologic atypia" in early 2000. (AR 150, 156.) On April 25, 2000, Plaintiff was admitted to Livingston Regional Hospital under the care of Dr. Terry to undergo a transabdominal partial hysterectomy. (AR 148.)) Dr. Terry discharged Plaintiff on April 27, 2000 with medication and instructions to rest. (AR 143.) Although the presence of cancerous cells was noted, she apparently did not require chemotherapy, radiation, or any further surgery.

Plaintiff visited Dr. Cox on August 29, 2000 for a checkup and complaining of pain in her heels. Dr. Cox performed a physical examination, which yielded normal results. Dr. Cox diagnosed Plaintiff with bursitis of the heels, but did not prescribe any additional medications. (AR 257.) On the same date, Plaintiff's glucose level was 144 and her HgbAIC was 8.0. (AR 233.)

Plaintiff visited with Dr. Terry on October 27, 2000 complaining of depression resulting from her hysterectomy that was so severe that she was "unable to move around and carry out daily activities." Dr. Terry diagnosed Plaintiff with depression and prescribed Zoloft and Premarin. (AR 151.) At that time, Plaintiff's glucose level was 159 and her HgbAIC was 8.2. (AR 302, 232.)

Plaintiff visited Dr. H. Alan Knudsen at the Cool Springs Podiatric Center on November 7, 2000 and December 12, 2000 for complaints of pain when standing and when walking. Dr. Knudsen performed x-rays of Plaintiff's feet and diagnosed Plaintiff with diabetes and "inferior calcaneal spurring with associated inflamation" in both feet. Dr. Knudsen prescribed oral NSAIDs, heel padding and diabetic shoe gear with the possibility of future orthotic therapy. Dr. Knudsen remarked that he did "not know what work-related activities [Plaintiff could] perform" at the time of the examination. (AR 161–62.)

On January 29, 2001, Plaintiff visited Dr. Terry "to discuss hormone replacement therapy." Plaintiff decided to continue taking Premarin. (AR 151.) Plaintiff also saw Dr. Cox around the same time,

who noted her "chronic pain." (AR 255.) Plaintiff's glucose level was 177 and her HgbAIC was 7.0. (AR 230.)

On February 6, 2001, Plaintiff visited optometrist Dr. Starla Meigs for an eye health and vision report. Dr. Meigs diagnosed Plaintiff with "mild non-proliferative diabetic retinopathy" and presbyopia. Dr. Meigs recommended monitoring Plaintiff's diabetic eye condition on a "close basis" but noted that Plaintiff was not disabled with regard to her vision because it was correctable to 20/20 in each eye. (AR 158.)

On April 4, 2001, Plaintiff met with Dr. Donita Keown for a consultative examination related to her application for disability. Dr. Keown found that Plaintiff's complaints were not suggestive of retinopathy or neuropathy. Dr. Keown noted in her physical examination of Plaintiff that Plaintiff was overweight, but found no other abnormalities. She specifically observed that Plaintiff's blood pressure that day was an acceptable 140/76, and that her hypertension was "controlled nicely with the use of hydrochlorothiazide and Accupril." (AR 163.) Dr. Keown noted that Plaintiff had no difficulty with range of motion in her limbs, did not evidence organ damage from her diabetes or hypertension, and showed no symptoms resulting from her hysterectomy. Dr. Keown opined that Plaintiff could sit, stand, or walk at least 6 hours in an 8-hour day, routinely lift 20 pounds, and episodically lift up to 40 pounds. (AR 163–68.)

On April 11, 2001 psychologist Dr. Linda Blazina performed a clinical interview, mental status evaluation and IQ assessment of Plaintiff. Dr. Blazina described Plaintiff's mood as euthymic but noted that she did not appear to have any other psychological problems. Dr. Blazina reported that Plaintiff was able to dress and bathe herself, perform "other self-care skills without difficulty," manage money, drive, grocery shop, clean house (but would have to frequently stop and rest in between chores), cook, read, eat out occasionally, meet with friends on a regular basis, attend church regularly, and teach a Sunday school class. Dr. Blazina administered the Winchester Adult Intelligence Scale-Third Edition, on which Plaintiff scored 80, within the low-average range. Dr. Blazina noted that Plaintiff might have "mild features of anxiety" and "occasional depressive feelings" brought about by stress related to her health problems. Otherwise, Dr. Blazina noted that Plaintiff was "functioning adequately in terms of her daily activity" and did not "demonstrate any noticeable limitations" when it came to her abilities to "understand and remember," "sustain concentration and persistence," socially interact, and adapt. (AR 169–76.)

Also on April 11, 2001, DDS physician Dr. Helena K. Perry completed a Residual Functional Capacity Assessment - Physical regarding Plaintiff. In her assessment, Dr. Perry noted that Plaintiff's primary diagnosis was obesity and her secondary diagnosis was diabetes mellitus; hypertension was listed as an "other alleged impairment." (AR 177.) Based upon her review of Plaintiff's medical records, Dr. Perry opined that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk for about 6 hours in an 8-hour workday and sit for about 6 hours in an 8-hour workday. Dr. Perry further opined that Plaintiff had unlimited ability to push and/or pull, and did not have any postural, manipulative, visual, communicative, or environmental limitations. Dr. Perry's opinion was based on the fact that after Plaintiff's partial hysterectomy, she had not required any further follow-up or treatment; and her diabetes and hypertension had not resulted in organ damage or neurological deficits and she had good range of motion in all joints. (AR 177–84.)

On April 24, 2001, DDS physician Dr. Ronald Kourany completed a Psychiatric Review Technique Form regarding Plaintiff. Dr. Kourany indicated that Plaintiff did not have any medically determinable mental impairment. Because Dr. Kourany determined that Plaintiff did not have any medically determinable mental impairment, he did not make any further indications on the form regarding psychological problems. (AR 185–98.)

Plaintiff met with Dr. Cox on May 2, 2001 for a three-month checkup Plaintiff reported that she had stayed on her diet but was experiencing fatigue and "a lot of pain in her feet." She also reported that her glucose levels had ranged between 200 and 250. (AR 254.) Her glucose level that day was 220. (AR 229.)

On June 22, 2001, Plaintiff visited Dr. Roelof van Der Meulen at East Tennessee EMG for an EMG and Nerve Conduction Study Report. The findings of both studies were normal but consistent with "a bilateral chronic radiculopathic process" for which "a specific root level" could not be found. (AR 225–27.)

Plaintiff returned to Dr. Cox on July 31, 2001 with complaints of epigastric pain. Plaintiff received a physical examination, abdominal and upper gastro-intestinal ultrasound and, the results of which were generally unremarkable. At that time Dr. Cox wrote a letter "To Whom It May Concern" stating that Plaintiff was "un-employable for the foreseeable future," because her "combined medical problems of

diabetes, hypertension, endometrial cancer and osteoarthritis [and] significant back problems" caused her to experience "significant weakness and malaise" and made her "unable to stand for long periods of time." Dr. Cox opined that Plaintiff was "totally and permanently disabled." (AR 252–53.)

On September 19, 2001, DDS physician Dr. Hamsaveni Kambam completed a Residual Functional Capacity Assessment Form regarding Plaintiff's physical abilities. Dr. Kambam opined that Plaintiff could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk for 6 hours in an 8-hour workday, and sit for about 6 hours in an 8-hour workday. Dr. Kambam found that Plaintiff was frequently limited in all postural limitations, including climbing, balancing, stooping, kneeling, crouching, and crawling. Dr. Kambam also found that Plaintiff had an unlimited capacity to push and pull, and had no postural manipulative, visual, communicative, or environmental limitations. His assessment was based on his review of the medical records indicating Plaintiff had 20/20 corrected vision in each eye, and recent tests had indicated normal ambulation, full range of motion, and no neurological problems. (AR 330–37.)

On November 2, 2001, Plaintiff visited Dr. Cox complaining of edema in her feet and legs, back pain and muscle cramps. Plaintiff told Dr. Cox that she was staying on her diet, but he noted that she had gained 9 pounds. (AR 423.) Plaintiff's glucose level was 108, and her HgbAIC was 7.6. (AR 447–48.)

Plaintiff returned to Dr. Cox on December 10, 2001 for a checkup. Dr. Cox noted that Plaintiff had muscle cramps, had been noncompliant with her diet and had not been checking her blood sugar on a regular basis. (AR 421.) Plaintiff's glucose level was 177, and her HgbAIC was 8.3. (AR 445–46.)

Plaintiff met with Dr. Cox on January 25, 2002 complaining of low back pain, bilateral hip pain, and leg radiculopathy. Plaintiff underwent a lumbar spine series, the results of which were normal. Dr. Cox diagnosed fluid retention, in addition to Plaintiff's previously diagnosed conditions. (AR 418–19.) Plaintiff's glucose level was 177, and her HgbAIC was 8.1. (AR 442–43.)

On January 29, 2002, Plaintiff underwent a CT scan of her spine, the results of which were unremarkable except for some "mild degenerative bony and disc space changes" that were most noticeable at L4-5 where there was "some bulging of the disc material as well as some ligamentous and facet hypertrophy." Plaintiff's resulting diagnosis was "mild acquired canal stenosis." (AR 441.)

Plaintiff met with Dr. Cox on March 29, 2002 for a two-month checkup. Plaintiff complained that her "back hurt a lot" and that she had "chronic" nausea and sinus congestion. Dr. Cox prescribed Avandia and Claratin. (AR 414.) Plaintiff's glucose level was elevated. (AR 440.)

Plaintiff stopped seeing Dr. Cox for a period of time after approximately March 2002 and started treatment with nurse practitioner Linda Baker at the Baxter Medical Clinic. (AR 363–96.) On her first visit, on May 16, 2002, her medications were noted to include Vioxx, Triamterene, hydrochlorothiazide, Metformin, Accupril, Metronidazole, Ranitidine, Methocarbamol, and Avandia. Her medical history was noted to include Type II diabetes, hypertension, arthritis, and dyspepsia. She was also diagnosed as having obesity, pedal edema, heel spurs, and allergic rhinitis. (AR 383–84.) Chest x-rays ordered that day were normal. (AR 396.) Plaintiff's glucose level was 314 and her HbgAIC was 12.6. (AR 391–92.) Plaintiff went to the Baxter Clinic for follow up on May 28, 2002. She was advised to obtain diabetic shoes. (AR 381.) She was also advised to visit the Diabetic Center and to undergo a cardiac evaluation on a later visit. (AR 382.)

On August 5, 2002, Plaintiff underwent a stress test which indicated "significantly reduced exercise capacity and evidence of anterior infarct with per-infarct ischemia." (AR 389.) However, Plaintiff was referred to Cookeville Regional Medical Center for a selective coronary angiography and a left ventriculography on September 3, 2002, the results of both of which were normal. (AR 376–77.) Likewise, on November 13, 2002, a "US Venous Doppler" performed at the Cookeville Regional Medical Center showed "no evidence of deep venous thrombosis." (AR 374.)

Plaintiff went to Baxter Medical Clinic on August 26, 2002 complaining of aching heels that were not helped by her diabetic shoes. (AR 375.) On September 12, 2002, Plaintiff complained about joint pain. She was advised to improve her diet and exercise and to continue taking her prescribed medications. (AR 373.) On November 15, 2002, Plaintiff complained of back pain and sought treatment for flu symptoms. Nurse Baker prescribed Humulin and Pletal. (AR 372.) Plaintiff's glucose that day was 156, and her HgbAIC was 6.3. (AR 387.)

On December 11, 2002 Plaintiff continued to complain of lower back and left hip pain. On March 13, 2003 she complained of low back pain, burning feet, and left hip pain. Her treatment notes from that day indicate that her diabetes was uncontrolled and that she was non-compliant with prescribed

treatment.  Plaintiff underwent a bone density test, and her prescription for Neurontin was increased.  (AR 365.)  Plaintiff returned to the Baxter Medical Clinic on March 14, 2003 to discuss the poor control of her diabetes.  It was recommended that she discontinue certain medications and start others.  (AR 364.)  At a phone consultation on March 17, 2003, Plaintiff indicated to the nurse practitioner who treated her that she was "hesitant to make changes" to her current medications as had been discussed during the previous visit.  The doctor noted that, secondary to her non-compliance with the recommended course of treatment and the poor control of her chronic illnesses, the nurse practitioner asked her to continue her current medications and transfer her care to another physician.  (AR 363.)

Shortly thereafter, Plaintiff began treatment with Dr. Cox again.  On April 7, 2003, Dr. Cox noted Plaintiff's "active" diagnoses to include diabetes mellitus, low back pain, and depression, and her "inactive" diagnoses to include endometrial cancer and osteoarthritis.  Current medications included Lopid for hyperlipidemia, Glucophage, Accupril, Neurontin, Lantus, hydrochlorothiazide, Pletal and "hdcn."  She was instructed to add Ibuprofen to her other medications.  (AR 412.)  On April 9, 2002 Plaintiff's glucose was "in range," but her HgbAIC was elevated at 7.9.  (AR 432.)

On April 22, 2003, Plaintiff met with Dr. Chilando Mulaisho at Endocrinology and Diabetes Care for evaluation of her type II diabetes.  Plaintiff's glucose level was 120 that day, and Dr. Mulaisho noted that Plaintiff reported that she monitored her blood sugar levels four times per day, and that the levels ranged from 100 to 200.  Dr. Mulaisho indicated that Plaintiff's review of symptoms was positive for neuropathy but not hypoglycemia or hyperglycemia.  Deep tendon reflexes were normal but sensation to touch and vibration was noted to be "slightly impaired."  (AR 399.)  Cardiac and "peripheral vascular system exams" were normal.  There were no signs of diabetic retinopathy, carotid bruits, or goiter.  Dr. Mulaisho performed an EKG which showed sinus rhythm and "evidence of probable oral antral septal myocardial infarction."  Dr. Mulaisho advised Plaintiff to continue taking Metformin, Actos, Neurontin, Accupril, and Gemfibrozil, and to start on Humulin and discontinue Lantus.  (AR 399–401.)

On May 7, 2003, Plaintiff returned to Dr. Cox complaining of chest pain.  (AR 411.)  The results of an EKG performed in June 2003 were normal.  Dr. Cox indicated that he saw "no evidence of acute stress induced coronary induced ischemia."  (AR 428.)

Plaintiff visited Dr. Cox on June 18, 2003 for "problems with diabetic shots" and pain in her legs, hips and lower back. Dr. Cox diagnosed depression for which he prescribed Effexor, and discontinued Pletal. (AR 407.) Plaintiff's glucose and HgbAIC were "in range." (AR 426–27.)

On August 10, 2003, Dr. Cox completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) regarding Plaintiff. Dr. Cox opined that Plaintiff could occasionally lift and/or carry 20 pounds, could frequently lift and/or carry less than 10 pounds, could stand and or walk for less than 2 hours in an 8-hour workday and could sit for less than 6 hours in an 8-hour workday. Dr. Cox further opined that Plaintiff was limited in her pushing and/or pulling abilities in her lower extremities. Dr. Cox indicated that Plaintiff could never perform any postural activities, but had no manipulative, visual, communicative, or environmental limitations. (AR 450–52.) In other words, according to Dr. Cox's assessment, Plaintiff was not capable of performing full-time work of any kind. His opinions regarding her limitations in walking, sitting or standing, in pushing or pulling and postural activities were based on "mechanical low back pain" and "diabetic peripheral neuropathy." (AR 450, 451.)

On September 22, 2003, Plaintiff was admitted to the Livingston Regional Hospital for "pain in the left chest" and glucose "elevated over 200." Plaintiff's physical examination revealed "tenderness" in her chest. (AR 461–62.) Plaintiff's chest x-ray revealed "indistinct opacity" at the "left lung base" but was otherwise unremarkable. (AR 489.) Plaintiff's exercise test indicated that her heart rate was significantly lower than expected but did not show any evidence of ST depressions or T-wave abnormalities. (AR 492.) Plaintiff's Persantine-Thallium study was also negative. Plaintiff was diagnosed with "noncardiac" chest pain, type II diabetes mellitus, essential hypertension, osteoarthritis, a history of endometrial carcinoma, and diabetic peripheral neuropathy. Plaintiff was discharged on September 23, 2003, and prescribed Indocin and Ibuprofen. (AR 461–63.)

On September 24, 2003, Plaintiff visited the emergency room at the Cookeville Medical Center complaining of a headache and dizziness. Plaintiff underwent a CT scan, the results of which were normal. Plaintiff was diagnosed with a severe headache, prescribed Todarol, Phenergan, and Midrin and was advised to contact Dr. Cox as soon as possible for referral to a neurologist. (AR 503–07.)

On October 8, 2003, Plaintiff met with Dr. Joseph Johnson at Cookeville Family Medical Services for a consultative examination at the Commissioner's request. Dr. Johnson noted that Plaintiff had a 20-

year history of hypertension and had had diabetes for 15 years. She complained of low back pain of several years duration and bilateral ankle pain. She also claimed to sleep 3 to 5 hours at night and to nap 2 or 3 hours a day. Per his physical examination, Dr. Johnson noted that Plaintiff was 5'1" and 240 pounds. Her blood pressure was 118/80. She had full range of motion and strength in her shoulders and hands, 50 degrees of flexion in her back, and normal range of motion and strength in her hips, knees and ankles. Gait was "slightly slow because her lateral ankles ache." (AR 454.) Based on his examination, Dr. Johnson opined that Plaintiff "should be able to sit for more than six hours during an eight-hour day, stand or walk for five hours during an eight hour day, routinely lift 20 pounds, and occasionally lift 35 pounds." (AR 455.) Dr. Johnson indicated that he had considered all of Plaintiff's medical records in formulating his opinion. (AR 453–56.) Dr. Johnson also completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) regarding Plaintiff on October 8, 2003 in which he expressed basically the same opinions. Dr. Johnson further opined that Plaintiff was unlimited in her ability to push and/or pull, and had no postural, manipulative, visual, communicative, or environmental limitations. (AR 457–60.)

On January 21, 2004, Dr. Johnson completed a series of interrogatories regarding his examination of Plaintiff. Dr. Johnson recalled that he had reviewed Plaintiff's records and believed he probably spent approximately "20-25 minutes with her," noting that her case was not complex from a disability evaluation standpoint. Dr. Johnson noted that his primary tool for determining impairments related to Plaintiff's diabetes was the history obtained directly from Plaintiff. Dr. Johnson reported that Plaintiff suffered from "severe fatigue" but could not determine if the fatigue resulted from her diabetes. Dr. Johnson explained that his conclusion that Plaintiff had "symptoms of mildly symptomatic diabetic retinopathy" was "based on the intermittent nature and on the quality of [her] symptoms." (AR 510–11.)

### B.    Plaintiff's Testimony

At the hearing, Plaintiff testified that she was born on August 23, 1959 and has an eighth grade education. She had never received her GED but is literate and has a driver's license. Plaintiff has not received any special job training or participated in vocational rehabilitation programs. (AR 534–35.)

Plaintiff testified that she lives with her daughter and husband, who is self-employed as a mechanic. Plaintiff stated that she had tried to work since February 2, 1997. (AR 535.) Plaintiff testified

that she left her previous job as a dishwasher after two or three weeks because a death in the family combined with her pain and nervousness made it so that she "couldn't cope" with the job anymore. (AR 535–36.) Plaintiff testified that a nursing home would not hire her "because of [her] abilities of standing and picking up and stooping and stuff." (AR 535.) Her last full-time job was at Russell Stover Candies in 1997. Plaintiff reported that she left that job because she was working seven days a week and she "just couldn't handle the many hours." (AR 536.) Plaintiff added that she had tendonitis and carpal tunnel in her hands so she could not work fast enough at Russell Stover, plus her feet had burned, and she had been tired "all the time" at that job. (AR 537.) Plaintiff reported that she "would take as many [absences] as [she] could without getting fired." (AR 357.)

Plaintiff testified that she had not attempted to find any sit-down jobs since Russell Stover and had no reason for her lack of attempts. (AR 536.) Plaintiff further stated, however, that she did not think she could work at a sit-down job because sitting down hurt her lower back and hips. (AR 538.)

Plaintiff stated that she had experienced back pain when standing and sitting for "about three or four years or so." (AR 538.) Plaintiff further testified that she had had back problems as far back as when she was working at Russell Stover but that she "just didn't find out what it was at the time." Plaintiff reported that she had managed to work by "switching back forth" from standing to sitting. (AR 539.)

Plaintiff testified that problems with her legs also kept her from working because "they shoot real sharp pains up my legs and up my heels and then they would go numb." (AR 539.) Plaintiff stated that it took her a while to get out of bed in the morning because of her leg pain, and that she had to rest again "and try to get [her] legs working" when she got to the bathroom. (AR 539.) She also complained about significant swelling in her legs and feet. (AR 542–43.) Plaintiff testified that she wore inserts in her shoes for her heel spurs, and that they helped. (AR 553.)

Plaintiff reported that her hysterectomy was her only surgery, and she had been told "they got" all the cancer at that time. (AR 543, 552–53.)

With respect to her diabetes, Plaintiff reported that "if [her blood sugar went] down, [she would] go weak and shake, [could not] function." (AR 540.) Plaintiff stated that she usually had a problem with her blood sugar going up or down "twice a week, sometimes more." (AR 540.) Plaintiff testified that she checked her blood sugar "three times a day" and that, in the week prior to the hearing, it had ranged from

94 to 231.  (AR 540.)  Plaintiff testified that she had trouble controlling her blood sugar despite regularly taking medication for her diabetes.   Plaintiff testified that she medication controlled her high blood pressure.  (AR 553.)

Plaintiff testified that she was 5'3", weighed 242 pounds.  (AR 542.)

Plaintiff reported that, on a typical day, she would be "up and down nearly" all night, waking up for good at 8:00 in the morning and checking her blood sugar by 8:30.  (AR 543.)  Plaintiff stated that she usually tried to cook, wash dishes, and do some laundry, "resting between all of this."  (AR 543.)  Plaintiff claimed that she had to "constantly" change positions to avoid pain while doing work around the house. (AR 554.)   Plaintiff testified that her blood sugar usually fell by afternoon, so she would have to eat something.  (AR 543–44.)  Plaintiff reported that when her blood sugar dropped, she got "a cold feeling coming over [her], and then [would] start shaking and [would] just get so weak [she could not] concentrate on things."  (AR 545.)  Plaintiff stated that she would then try to cook supper and load the dishwasher for the next morning, since she had her highest level of energy in the morning.  (AR 544.)  Plaintiff testified that she tried to do "simple" chores around the house to keep tidy – for example, the week of her hearing she had vacuumed but not swept – and that her daughter, daughter-in-law, and granddaughter would help sometimes.  (AR 544.)  Plaintiff reported that she would sit or lie down to rest "five or six hours a day" and would usually stay down for an hour at a time.  (AR 544–45.)  Plaintiff stated that she could stand for about 30 minutes at a time, but she could only be on her feet for an hour total in an 8-hour period.  (AR 550.)  Plaintiff stated that she could sit for about 2 hours at a time, and she could sit for "probably four to six" hours total in an 8-hour period.  (AR 550.)  Plaintiff testified that she could only lift 10 to 15 pounds. (AR 550.)  Plaintiff reported that she could bend over only "so far" and then would have to squat to picking something up.  (AR 551.)

Plaintiff testified that her condition had been "gradually getting worse" since 1997.  (AR 547.) Plaintiff reported that in 1997 she "could work a little better [and] didn't have to rest as much."  (AR 547.) Plaintiff testified that she had never had to go the hospital because of her diabetes but had been "almost" passing out from high blood sugar for 2 or 3 years.  (AR 547–48.)  Plaintiff reported that the pain in her back, legs, and feet was "constant," and that her back pain was the worst.  (AR 551.)  On a scale of one to ten, with ten being the most severe pain, Plaintiff reported that the pain in her back, feet, and legs was

a five. (AR 551.) Plaintiff further testified that standing and sitting increased the pain, but lying down initially decreased it. (AR 551–52.) Plaintiff stated that she took prescription Ibuprofen for her pain and a pill for "stress," which helped. (AR 552.)

Plaintiff testified that her daily activities including driving a little, usually with someone else in the car; reading and comprehending some of what she read; attending church; teaching Sunday school, and gardening a little. Plaintiff elaborated on gardening by stating that she could only be out in the garden for "maybe an hour" (AR 553), and that she was often prevented from gardening by rain and because "the weeds got real bad." (AR 548–50.) She did not watch television or visit friends or relatives much and did not mow the grass. Plaintiff reported that she could bathe herself, dress herself, and do her own hair. (AR 549.)

C.      Vocational Testimony

Vocational expert ("VE") Dr. Gordon Doss also testified at Plaintiff's hearing. He confirmed that he was testifying in accordance with the *Dictionary of Occupational Titles* (the "DOT"). The VE described Plaintiff's past relevant work as a dishwasher at an elementary school as medium and unskilled under the DOT, and her job at Russell Stover as a hand-packer and cleaner as light and unskilled. (AR 533.)

The ALJ asked the VE to consider a hypothetical situation in which a claimant with Plaintiff's age, education and work experience was able to perform sedentary work requiring only occasional postural activities such as climbing, balancing, stooping, crouching, kneeling and crawling, that afforded a sit/stand option at will, and permitted a moderate loss of concentration, persistence and pace. The ALJ asked the VE whether any sedentary work that permitted those restrictions exited in the Tennessee regional economy. (AR 555.) In response, the VE noted that the lack of a high school education would limit the number of unskilled entry-level jobs, but that even given that limitation, there were between 700 and 800 unskilled, entry-level receptionist jobs available in the regional economy; 989 telephone order clerk jobs, approximately 1,800 general office clerk jobs; 1,309 inspector or grader jobs in the factory setting; and 2,400 telemarketer or telephone appointment setter jobs, all of which would be appropriate for the hypothetical claimant. (AR 555–56.)

The VE agreed that a claimant with the same restrictions but suffering a marked (rather than moderate) loss of concentration, persistence and pace would not be able to work. (AR 556.) The VE

also testified that if he assumed the restrictions set forth in Dr. Cox's Medical Assessment of Ability to do Work-Related Activities (Physical) form (AR 449–52), such a claimant would not be able to work full-time. (AR 556.)  The VE stated that a person would also not be able to work full-time if he or she was medically required to lie down during the work day other than during breaks.  (AR 556–57.)

Finally, the VE testified that, if Plaintiff's testimony were considered fully credible, Plaintiff had described herself as able to sit, stand and walk in combination for a total of seven hours but not eight full hours, and that she would need to lie down for about an hour.  The VE testified that if the need to recline for as long as an hour could be take care of before or after work or during lunch hour, then a person with the limitations Plaintiff ascribed to herself would still be able to work.  (AR 557.)

**D.      The ALJ's Findings**

In reaching his determination that Plaintiff is not disabled, the ALJ made the following specific findings:

> 1.      The claimant meets the non-disability requirements for a Period of Disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through December 31, 2002.
>
> 2.      The claimant has not engaged in substantial gainful activity since the amended alleged onset of disability.
>
> 3.      The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(b) and 416.920(b).
>
> 4.      These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.
>
> 5.      The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.
>
> 6.      The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR §§ 404.1527 and 416.927).
>
> 7.      The claimant retains the functional capacity for sedentary work. Specifically, the claimant can lift 10 pounds occasionally, is able to stand for 2 hours and to sit for 6 hours in an eight-hour workday with a sit/stand option at will, and is able to occasionally perform postural activities including climbing, balancing, stooping, crouching, kneeling and crawling.    Pain results in a moderate impairment in concentration.
>
> 8.      The claimant is unable to perform any of her past relevant work (20 CFR §§ 404.1565 and 416.965).

9.     The claimant is of "younger individual age 18–44" [sic] (20 CFR §§ 404.1563 and 416.963).

10.     The claimant has a "marginal education" (20 CFR §§ 404.1564 and 416.964).

11.     The claimant has no transferable skills from past work and transferability of skills is not an issue in this case (20 CFR §§ 404.1568 and 416.968).

12.     Given the claimant's functional capacity for a wide range of sedentary work and her vocational factors, Medical-Vocational Rule 201.24 of Table No. 1 of Appendix 2 Subpart P, Regulations No. 4, provides a framework for a conclusion that the claimant is not disabled.   The Administrative Law Judge concludes that the claimant retains the capacity for work that exists in significant numbers in the national economy. The claimant could work as a receptionist (773 jobs statewide), a telephone order clerk (989 jobs statewide), an inspector/grader (1,309 jobs statewide), and work as a general office clerk (2,400 jobs statewide).

13.     The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(g) and 416.920(g)).

AR 26–27.

## III.     DISCUSSION

### A.     Standard Of Review

Under the Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.   The Act provides that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."   42 U.S.C. § 405(g).   This Court, therefore, is limited to determining whether substantial evidence supports the Commissioner's findings and whether the Commissioner applied the correct legal standards.   *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).   If substantial evidence supports the ALJ's conclusion, this Court cannot reverse the ALJ's decision even if substantial evidence exists in the record that would have supported an opposite conclusion. *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995).   Substantial evidence is more than a scintilla of evidence, but less than a preponderance.   *Richardson v. Perales*, 402 U.S. 389, 401 (1971).   Substantiality is based upon the record taken as a whole.   *Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

### B.     Evaluation Of Entitlement To Social Security Benefits

Under the Social Security Act (the "Act"), Plaintiff is entitled to receive benefits only if he is deemed "disabled."   42 U.S.C. § 423(d)(1)(A).   The Act defines "disability" as the "inability to engage in

any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

In applying the standards for determining disability, the Secretary has promulgated regulations setting forth a five-step sequential evaluation process. *See* 20 C.F.R. §§ 404.1520 and 406.920. An ALJ must proceed through the required sequential steps for evaluating entitlement to disability insurance benefits. *See id.* The Sixth Circuit has summarized the steps as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997); 20 C.F.R. § 404.1520(b)-(f). The claimant has the burden of going forward with the evidence at the first four steps and the Commissioner has the burden at step five to show that alternate jobs in the economy are available to the claimant, considering his age, education, past work experience and residual functional capacity. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

**C.      Plaintiff's Statement Of Errors**

Plaintiff contends that the ALJ erred in (1) finding that Plaintiff did not have an impairment that met or equaled one of the listed impairments, (2) finding that Plaintiff's complaints of pain and limitations were not completely credible, (3) failing to distinguish between part-time and full-time jobs in his discussion with the VE, and (4) failing to give proper weight to the opinion of Dr. Michael Cox, Plaintiff's treating physician. (Doc. No. 12, at 10, 14, 17.) Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed or, in the alternative, remanded.

***1. Whether Plaintiff's Impairments Medically Equaled a Listed Impairment***

Plaintiff argues that her "degenerative disc disease" meets or equals the listed impairment of lumbar spinal stenosis, under 20 C.F.R., Pt. 404, Subpt. P, App. 1, §1.04(C). (Doc. No. 12, at 13.) Plaintiff argues that her back problems are severe enough to meet or equal this listed impairment because, she claims, she can only remain on her feet for one hour in an eight hour day; she has trouble climbing stairs; her back pain is five on a scale of ten; she is obese; her foot, leg, and back pain is chronic; and a January 29, 2002 CT scan revealed a bulging disc at L4-5 as well as acquired canal stenosis. (Doc. No. 12, at 13–14.) Plaintiff contends, therefore, that she is entitled to benefits at step three of the five-step analysis.

The Court finds, however, that the ALJ's determination that Plaintiff did not meet or equal a listed impairment is supported by substantial evidence in the record. As an initial matter, Plaintiff's support for this statement of error is based primarily upon her subjective complaints. (*See, e.g.*, AR 542, 549–51.) As will be discussed in greater detail below, the ALJ properly determined that Plaintiff's "allegations regarding her limitations are not totally credible." (AR 26.) Because the ALJ properly determined that Plaintiff's subjective complaints were not totally credible, he was not bound to accept her allegations in that regard.

Second, in order for degenerative disc disease to meet or equal the listed impairment of lumbar spinal stenosis, Plaintiff must have "chronic non-radicular pain and weakness" that causes an "inability to ambulate effectively," as shown by "findings on appropriate medically acceptable imaging." 20 C.F.R., Pt. 404, Subpt. P, App. 1, §1.04(C). Under the Regulations, an inability to ambulate effectively means an extreme limitation of the ability to walk. *See id.* § 1.00(B)(2)(b)(1) & (2) (indicating that to ambulate effectively, an individual must be capable of sustaining a reasonable walking pace over a sufficient distance to travel without companion assistance to and from a place of employment). Here, the medical evidence in the record includes a CT Scan performed on January 29, 2002 which showed "some *mild* degenerative bony and disc space changes . . . throughout the lumbar spine with these changes most severe at L4-5 where there is some bulging of the disc material as well as some ligamentous and facet hypertrophy." As a result of this scan, Plaintiff was diagnosed with "*mild* acquired canal stenosis L4-5." (AR 441 (emphasis added).) In other words, this objective medical evidence does not establish a basis

for the type of chronic pain of which Plaintiff complains.  In addition, there is no evidence in the record that her back pain has led to an inability to ambulate effectively.

Other evidence in the record similarly fails to support Plaintiff's claim that she has severe degenerative disc disease, and evaluations from other physicians further support the ALJ's decision.  For example, Dr. Keown noted that Plaintiff had "intact" range of motion in her extremities, "no scoliotic curvature or spasm" in her spine, and "no difficulty with ambulation."  (AR 168.)  Dr. Johnson noted Plaintiff's complaints of lower back pain, but opined based on his examination that she could sit for more than six hours in an eight-hour period and stand or walk for five hours in an eight-hour period.  (AR 455.)  The ALJ discussed these findings in his decision and also noted that, although Plaintiff did not have "full range of motion" in her back, she still was able to drive, visit friends, attend church, teach Sunday School, and do household chores such as laundry and cooking.  (AR 21–24.)

As has been noted, the reviewing court does not substitute its findings for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences.  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached.  *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389 (6th Cir. 1999).  Although there is evidence in the record to support Plaintiff's claims, there is also much evidence in the record that contradicts those claims.  When there is conflicting evidence in the record, the decision which evidence to accord credence is within the province of the ALJ.  *See, e.g.*, *Walters*, 127 F.3d at 531; *Moon*, 923 F.2d at 1182–83; *Blacha v. Sec'y, Health & Human Servs.*, 927 F.2d 228, 230 (6th Cir. 1990); *Kirk v. Sec'y, Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981).  The ALJ's decision that Plaintiff did not suffer from an ailment that met or equaled a listed impairment was properly supported by substantial evidence.  The ALJ's decision must therefore stand.

### 2. Plaintiff's Subjective Complaints of Pain

Plaintiff contends that in finding that her subjective complaints were not fully credible, the ALJ "put too much emphasis on [her] ability to carry out rudimentary daily activities as evidence of non-disability." (Doc. No. 12, at 15.)  Plaintiff cites a non-binding district court case for the proposition that "the ability to prepare meals for dependents, occasionally visit with friends, watch TV, and read does not qualify as the

ability to do substantial gainful activity and cannot be reasonably characterized as a great deal of physical activity" such that it "demonstrate[s] substantial activity that she is not disabled." *Barry v. Shalala*, 885 F. Supp. 1224, 1249–50 (N.D. Iowa 1995).

The Sixth Circuit, however, has set forth the following criteria for assessing a plaintiff's allegations of pain:

> [S]ubjective allegations of disabling symptoms, including pain, cannot alone support a finding of disability. . . .  [T]here must be evidence of an underlying medical condition and (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from the condition or (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.

*Duncan v. Sec'y, Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting S. Rep. No. 466, 98th Cong., 2d Sess. 24); *see also* 20 C.F.R. §§ 404.1529, 416.929 ("[S]tatements about your pain or other symptoms will not alone establish that you are disabled. . . ."); *Moon*, 923 F.2d at 1182–83 ("[T]hough Moon alleges fully disabling and debilitating symptomology, the ALJ may distrust a claimant's allegations . . . if the subjective allegations, the ALJ's personal observations, and the objective medical evidence contradict each other.").  Moreover, "allegations of pain . . . do not constitute a disability unless the pain is of such a debilitating degree that it prevents an individual from engaging in substantial gainful activity."  *Bradley v. Sec'y, Health & Human Servs.*, 862 F.2d 1224, 1227 (6th Cir. 1988).

When analyzing the claimant's subjective complaints of pain, the ALJ must also consider the following factors and how they relate to the medical and other evidence in the record:  the claimant's daily activities; the location, duration, frequency and intensity of claimant's pain; the precipitating and aggravating factors; the type, dosage and effect of medication; and the other treatment or measures to relieve pain.  *See Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994) (construing 20 C.F.R. § 404.1529(c)(2)).  After evaluating these factors in conjunction with the evidence in the record, and by making personal observations of the claimant at the hearing, an ALJ may determine that a claimant's subjective complaints of pain and other disabling symptoms are not credible.  *See, e.g., Walters*, 127 F.3d at 531; *Blacha*, 927 F.2d at 230.

In the instant case, the ALJ found that, although Plaintiff claimed to be in "constant pain," the objective medical evidence and her reported daily activities did "little to support her allegations of disabling pain."  (AR 24.)  Specifically, the ALJ noted, inter alia, the consistency of Drs. Johnson,

Mulaisho, and Keown's assessments and the lack of an "extensive back exam in the record." (AR 24.) The ALJ also articulated that Plaintiff was involved in activities such as driving, visiting with friends, attending church, teaching Sunday school, performing household chores, doing laundry, and cooking. (AR. 24.) The ALJ additionally observed that Plaintiff had "full strength in the hands, arms, and legs, and normal reflexes," took Ibuprofen which helped with the "constant pain," and could usually ambulate without difficulty. (AR 21–24.)

The ALJ's decision specifically addresses not only the medical evidence, but also Plaintiff's testimony and her subjective claims, clearly indicating that these factors were considered. (AR 21–27.) The ALJ's decision properly discusses Plaintiff's "activities; the location, duration, frequency and intensity of claimant's pain; the precipitating and aggravating factors; the type, dosage and effect of medication; and the other treatment or measures to relieve pain." *Felisky*, 35 F.3d at 1039 (construing 20 C.F.R. § 404.1529(c)(2)). It is clear from the ALJ's detailed articulated rationale that, although there is evidence which could support Plaintiff's claims, the ALJ chose to rely on medical findings that were inconsistent with Plaintiff's allegations. This is within the ALJ's province.

The ALJ, when evaluating the entirety of the evidence, is entitled to weigh the objective medical evidence against Plaintiff's subjective claims of pain and reach a credibility determination. *See, e.g.*, *Walters*, 127 F.3d at 531; *Kirk*, 667 F.2d at 538. An ALJ's findings regarding a claimant's credibility are to be accorded great weight and deference, particularly because the ALJ is charged with the duty of observing the claimant's demeanor and credibility. *Walters*, 127 F.3d at 531 (citing *Villarreal v. Sec'y, Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987)). Discounting credibility is appropriate when the ALJ finds contradictions among the medical reports, the claimant's testimony, the claimant's daily activities, and other evidence. *See Walters*, 127 F.3d at 531 (citing *Bradley*, 682 F.2d at 1227). If the ALJ rejects a claimant's testimony as not credible, however, the ALJ must clearly state the reasons for discounting a claimant's testimony, *see Felisky*, 35 F.3d at 1036, and the reasons must be supported by the record, *King*, 742 F.2d at 975.

After assessing all the objective medical evidence, the ALJ determined that Plaintiff's "allegations regarding her limitations are not totally credible." (AR 26.) As has been noted, this determination is within the ALJ's province. The ALJ observed Plaintiff during her hearing, assessed the medical records,

and reached a reasoned decision; the ALJ's findings are supported by substantial evidence and the decision not to accord full credibility to Plaintiff's allegations was proper. Therefore, Plaintiff's second claim of error also fails.

### 3. The Availability of Part-Time Jobs

Plaintiff contends that the ALJ erred by failing to discuss with the ALJ the availability of part-time jobs. (Doc. No. 12, at 16–17.) The Court is completely baffled as to what exactly Plaintiff is attempting to argue. Plaintiff correctly points out that the ability to perform a part-time job is not accepted by the Social Security Administration as a basis for denying benefits. Consequently, the availability of part-time jobs, like Plaintiff's ability to perform part-time jobs, is not relevant to a discussion of whether Plaintiff is disabled. From the transcript of the hearing, it is clear that both the VE and the ALJ understood this, as the VE acknowledged that a person who was unable to work an eight hour work day would be considered disabled. (AR 557.) This contentions of error fails.[1]

### 4. Weight Accorded to Opinion of Plaintiff's Treating Physician

Plaintiff maintains that the ALJ did not give proper weight to the opinions of Dr. Cox, Plaintiff's treating physician.

With regard to the evaluation of medical evidence, the applicable regulation states,

Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.

(1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed

---

[1] If Plaintiff intended to argue that the ALJ erred in not having the VE clarify whether any of the jobs he testified were available in the regional economy were full-time or part-time jobs, such an argument would also fail. There is simply no basis for believing the ALJ was enumerating part-time jobs.

in paragraphs (d)(2)(I) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. . . .

(3) Supportability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. . . .

(4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist. . . .

20 C.F.R. § 416.927(d). *See also* 20 C.F.R. § 404.1527(d).

If the ALJ rejects the opinion of a treating source, he is required to articulate some basis for rejecting the opinion. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). The Regulations define a "treating source" as "your own physician, psychologist, or other acceptable medical source who provides you or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 404.1502.

Dr. Cox, who treated Plaintiff for an extensive period of time, would clearly be considered a "treating source," a fact that would justify the ALJ's giving greater weight to his opinion than to other opinions if his opinion was supported by, and consistent with, other evidence of record. *See, e.g.*, 20 C.F.R. §§ 416.927(d)(2) & 404.1527(d)(2). On July 31, 2001, Dr. Cox wrote a letter describing Plaintiff as "totally and permanently disabled for employment." (AR 252.) The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, however, because the definition of disability requires consideration of both medical and vocational factors. *See, e.g.*, *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Hall v. Bowen*, 837 F.2d 272, 276 (6th Cir. 1988). Dr. Cox's opinion that Plaintiff was "totally and permanently disabled for employment" is strictly his medical opinion, and is in contrast with vocational factors.

Moreover, Dr. Cox's opinion contradicts other substantial evidence in the record. The ALJ specifically noted, inter alia, that Dr. Cox's assessment of Plaintiff contradicted those of Dr. Johnson, Dr. Keown, and Dr. Mulaisho, which were consistent with each other, and that objective medical testing revealed only mild canal stenosis at L4-5, mild neuropathy, and a full range of motion in all joints except the back, which showed 50 degrees of flexion. (AR 24.) Dr. Cox's assessment also took into account

Plaintiff's subjective complaints of pain, which the ALJ did not find to be completely credible, as noted above.

When there is contradictory evidence in the record, the treating physician's opinion is weighed against the contradictory evidence under the criteria listed above. When there are inconsistent opinions, the final decision regarding the weight to be given to the differing opinions lies with the Commissioner. 20 C.F.R. § 416.927(e)(2). As such, the Regulations do not mandate that the ALJ accord Dr. Cox's evaluation controlling weight. Accordingly, Plaintiff's argument fails.

IV.     **CONCLUSION**

For the reasons stated above, the Court finds that the ALJ's decision is supported by substantial evidence, and that the record supports a finding that Plaintiff is not disabled within the definition of the Social Security Act. Accordingly, Plaintiff's motion for judgment on the administrative record will be denied and the decision of the Commissioner affirmed. An appropriate Order will enter.


Thomas A. Wiseman, Jr.
Senior U.S. District Judge